# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF IOWA
### CENTRAL DIVISION

| | |
|---|---|
| GARY DEMERCURIO and JUSTIN WYNN,<br><br>        **Plaintiff,**<br><br>v.<br><br>**DALLAS COUNTY, IOWA and CHAD LEONARD**<br><br>        **Defendants** | **Case No.: 4:23-cv-00210-SHL-HCA**<br><br>**FOURTH AMENDED COMPLAINT AND JURY DEMAND** |

COME NOW Plaintiffs and, for their amended causes of action against these defendants, state:

## PARTIES

1. Plaintiff Gary DeMercurio is a resident of Washington State.

2. Plaintiff Justin Wynn is a resident of Florida.

3. Defendant Dallas County, Iowa is a governmental entity and operates the Dallas County Sheriff's Department.

4. Defendant Chad Leonard (herein "Leonard") is a resident of Dallas County, Iowa and was at all times relevant an employee of Dallas County, employed as its Sheriff.

## FACTUAL ALLEGATIONS

5. At all times relevant, Gary DeMercurio was an employee of Coalfire Labs ("Coalfire") a cybersecurity firm headquartered in Colorado.

6. At all times relevant, Justin Wynn was an employee of Coalfire.

7. In 2015, the Iowa Judicial Branch, through the State Court Administrator, retained Coalfire to perform a cybersecurity analysis of the Iowa Court system.

8. The Iowa Judicial Branch and Coalfire entered into a Master Agreement at that time.

9. Thereafter, the Iowa Judicial Branch and Coalfire entered into a Service Order and Rules of Engagement in the Spring of 2015 for the performance of certain cybersecurity testing activities, including physical penetration.

10. As part of the agreement, the Iowa Judicial Branch provided a Letter of Authorization to Coalfire and its employees. This authorization is euphemistically called a "get out of jail free" letter.

11. The "get out of jail free" letter is intended to protect Coalfire employees working on the project from being wrongfully arrested for performing those necessary contractual activities that could be misinterpreted as criminal acts.

12. This engagement resulted in a report issued by Coalfire to the Iowa Judicial Branch in May 2015.

13. In 2019, the Iowa Judicial Branch, through the State Court Administrator, again retained Coalfire to perform a cybersecurity analysis of the Iowa Court system.

14. Again, a Service Order and Rules of Engagement were prepared and discussed between Coalfire employees and employees of the Iowa Judicial Branch.

15. The Rules of Engagement provided that the plaintiffs would be the employees responsible for carrying out the activities requested by the Iowa Judicial Branch.

16. The request by the Iowa Judicial Branch was for Coalfire employees to test the security of the Iowa Judicial Branch, including district court level facilities and determine what weaknesses existed in those facilities.

17. The request by the Iowa Judicial Branch included testing the security of 5 physical facilities, namely the Iowa Judicial Branch Building (with some limitations) in Des Moines, the Polk County Courthouse in Des Moines, the Juvenile Justice Center in Des Moines, the Criminal Court Area in Des Moines, and the Dallas County Courthouse in Adel, Iowa.

18. The Rules of Engagement included external, internal, and application testing.

19. The Rules of Engagement also included social engineering activities that involved "physical attacks" as part of "physical security assessments." A physical attack included "lockpicking."

20. These "physical attacks" were to be conducted "during the day and evening."

21. The Rules of Engagement anticipated that plaintiffs would seek to breach judicial branch buildings so long as done without causing significant physical damage to the buildings, such as breaking windows.

22. The Iowa Judicial Branch approved the surreptitious entry of judicial branch and courthouse buildings by the plaintiffs. This was approved both in writing and in oral

communications with the plaintiffs. This included breaching the buildings so long as there was no physical damage to the building.

23. The security penetration efforts to be performed by the plaintiffs were to begin on September 8, 2019, and end on September 13, 2019.

24. The Iowa Judicial Branch specifically did not want "local law enforcement or security persons to be notified" in advance about the penetration testing that was to be performed by the plaintiffs.

25. To protect the plaintiffs, the Rules of Engagement included a Letter of Authorization ("get out of jail free") letter signed by employees of the State Court Administrator's Office of the Iowa Judicial Branch.

26. The plaintiffs were to carry the letter with them and show the letter to any law enforcement or other individual to avoid arrest.

27. The purpose of conducting this testing was to identify areas of weakness in the physical and cyber environment of the court system that could be used to prevent similar breaches by malicious actors.

**PENETRATION TESTING**

28. As contracted, the plaintiffs tested the security systems at the Polk County Courthouse and adjacent buildings, as well as at the Iowa Judicial Branch Building during the period of September 8-10, 2019.

29. This testing included plaintiffs leaving a business card at the Judicial Building in Des Moines after breaching the security system there.

30. On the morning of September 10, 2019, an employee of the Iowa Judicial Branch acknowledged and congratulated Plaintiffs for entering the Judicial Building without being detected.

31. On the evening of September 10-11, 2019, plaintiffs went to the Dallas County Courthouse to perform penetration testing.

32. When plaintiffs arrived, they found one of the doors to the courthouse unlocked. To continue with their testing, the plaintiffs closed and locked that door and then began the process of trying to enter. **No physical damage was caused to the doors**.

33. During their efforts, they intentionally tripped the alarm, recognized that the alarm had been tripped, and waited for law enforcement to arrive.

34. Setting off the alarm is an expected event as the purpose of the penetration testing is to determine if existing systems work.

### THE ARREST OF THE PLAINTIFFS

35. At approximately 1235am on September 11, 2019, deputies from the Dallas County Sheriff's Office arrived.

36. **At 1241am**, Plaintiffs identified themselves and provided the "get out of jail free" letter signed by the representative from the Iowa Judicial Branch.

37. After reviewing the letter, the deputies contacted one of the individuals who signed the "get out of jail free" letter.

38. That representative of the Iowa Judicial Branch verified that the plaintiffs were acting within the scope of the contract by being at the Dallas County Courthouse.

39. **Between 1241am and 1254am, one or more deputies had calm conversations with the Plaintiffs. The topics of conversation included why they were there, what they had found when they arrived, their job duties as part of the project, and so-called war stories regarding Plaintiffs' work.**

40. **The questions asked by the Deputies included "how does one get a job like that?" and "what's the craziest story that you guys have of doing this?"**

41. **At 12:54am, one of the Dallas County deputies tells Dallas County Aaron Sanchez that he has spoken with the chief security officer for the Iowa Courts, confirming that the plaintiffs were working under a contract with the Iowa Judicial Branch. Deputy Sanchez asks this deputy if they "are good to go" and is told that they are "good to go." Deputy Marchant states: "I want a job like that."**

42. **Immediately after being provided with confirmation that the Plaintiffs were working for the benefit of and with the consent of the court system, Deputy Sanchez tells the Plaintiffs that they are "good to go."**

43. **On the scene at the Dallas County Courthouse before Sheriff Leonard arrived were five (5) deputies from the Dallas County Sheriff's Office and one Adel Police Officer. None of these six law enforcement officers ever evidenced any interest in nor voiced any desire to arrest the Plaintiffs before Sheriff Leonard arrived.**

44. However, before Plaintiffs left, Dallas County Sheriff Chad Leonard arrived **at 1257am.** When Leonard arrived, the situation changed.

45. **In learning that Sheriff Leonard was going to take over the scene, Deputy Marchant states "this ought to be good."**

46. **The Plaintiffs told Sheriff Leonard they were working under a contract with Iowa Courts. In response, Sheriff Leonard told them that "maybe they can come and bond you out."**

47. **Leonard was made aware, by the deputies on the scene, of the contract with and approval by the Iowa Judicial Branch of the work being performed by the Plaintiffs.**

48. **Leonard knew that the Plaintiffs were working for the benefit of the State of Iowa, had been authorized by the State of Iowa (Iowa Judicial Branch) to enter the building for the purpose of testing the court security system, and were simply doing their jobs.**

49. Leonard refused to recognize the authority of the Iowa Judicial Branch to permit Plaintiffs to perform testing at the Dallas County Courthouse. **Leonard ordered his deputies to arrest the Plaintiffs.**

50. **The Iowa Judicial Branch is entitled to use of the Dallas County Courthouse pursuant to Iowa Code §602.1303 and Iowa Code §331.365 and, pursuant to article V, §4 of the Iowa Constitution, the Iowa Supreme Court "shall exercise supervisory and administrative control over all interior Judicial tribunals throughout the State."**

**51.** Accordingly, Plaintiffs had been provided with the "permission or authority" to enter the Dallas County Courthouse by a possessor of that property. Further, the State of Iowa was either a "lessee, or person in lawful possession" as defined by Iowa Code §716.7(2)(a).

**52.** Sheriff Leonard had a phone call that evening with one of the state officials listed in the "Get Out of Jail Free" letter, who, after explaining that the Plaintiffs were working on behalf of the State of Iowa, questioned the authority of the sheriff to arrest the Plaintiffs. Sheriff Leonard was upset by the affront to his authority and continued with the arrest of the Plaintiffs. Sheriff Leonard later complained to state officials about the manner in which this state official had spoken to him. The state official was later disciplined for the manner in which he spoke to the Sheriff.

**53.** Leonard already had a personal animus with the authority of the State of Iowa and his refusal to recognize the authority of the Iowa Judicial Branch and the manner in which he was approached colored his decision-making.

54. Despite a lack of probable cause, Plaintiffs were arrested, their property seized, they were booked and held in the County Jail for approximately 20 hours. They were each held on a $50,000 bond.

55. Sheriff Leonard refused to reconsider his decision to arrest the plaintiffs and pressed for the continued prosecution of the plaintiffs. **Sheriff Leonard maintained communication with the Dallas County Attorney and sought to influence the**

continued prosecution of the Plaintiffs by exerting his power as the Sheriff of the same county and by his public statements made after the arrest of the plaintiffs.

56. Initially, the Plaintiffs were accused of the following crimes:

a. Burglary in the 3rd Degree pursuant to Iowa Code §713.6A(1).

b. Possession of Burglar Tools pursuant to Iowa Code §713.7.

57. Eventually, the charges were amended to Trespass **under Iowa Code §716.7(2)(a) and §716.8(1)**.

58. But when plaintiffs moved to dismiss that charge for a lack of evidentiary **and legal** support, the Dallas County Attorney's office agreed to the dismissal of the amended charges.

### STATEMENTS AFTER THE ARREST OF THE PLAINTIFFS

**59. In the days and weeks after the arrest of the Plaintiffs, Sheriff Leonard continued to claim that the Plaintiffs had burglarized the Dallas County Courthouse. He did so in statements to state officials, through the press, and to local citizens. The statements included a description of what he knew on the evening of September 11 and reflected his knowledge at that time that these individuals were working as part of a contract with the State of Iowa. Nevertheless, he continued to claim that these individuals had committed a crime, even though there was no evidentiary or legal support for that position.**

**60. As an example, on or about September 26, 2019, Sheriff Leonard made statements to the Central Committee of the Republican Party continuing to claim**

that the Plaintiffs were "burglars" and had committed a crime. He made the statements with full knowledge that these individuals were working for a company that had contracted with the State of Iowa to perform security and cybersecurity services for the court system and were made with knowledge that the statements were false or with reckless disregard for the truth. Sheriff Leonard's statements were not privileged.

61. Throughout the criminal prosecution, Sheriff Leonard continued to claim the Plaintiffs were criminals, making statements such as: "I stand by the decision I made" and "I do look forward to informing the public of everything." Sheriff Leonard's statements to the press were not privileged.

## CAUSES OF ACTION

## COUNT I

1. Plaintiffs assert common law claims against Dallas County and Chad Leonard for false arrest, abuse of process, defamation, intentional infliction of emotional distress, and malicious prosecution.

a. The false arrest and intentional infliction of emotional distress claims are premised on Sheriff Leonard's failure to obtain probable cause to effect the arrest, because he knew that the State of Iowa was a "lessee or person in lawful possession" of the premises, and because he knew that the Plaintiffs had "permission or authority" to enter the building and had no intent to commit a crime since they were working under the contract with the State of Iowa. Mistake of law

**does not qualify for probable cause. Further, he knew that subjecting the Plaintiffs**

**to an arrest would impact their ability to perform their profession in the future, and**

**knew that subjecting them to the indignity of an arrest, jailing, and legal process**

**would cause them severe emotional distress.**

      **b.  The abuse of process claim is premised on Sheriff Leonard's**

**improper motive of using the arrest and the subsequent media attention to**

**embarrass State officials.**

      **c.  The defamation claim is premised on the arrest without probable**

**cause, as well as the comments subsequent to the arrest in which Sheriff Leonard**

**continued to press the claim that the plaintiffs had acted as criminals, knowing that**

**to be untrue or with reckless disregard for the truth.**

      **d.  The malicious prosecution claim is premised on Sheriff Leonard**

**using his power as the Sheriff of the County to influence the continued prosecution**

**of the Plaintiffs.**

      2.  In addition, Plaintiffs assert a claim against Chad Leonard pursuant to 42

USC §1983 for the deprivation of their United States Constitutional rights while Chad

Leonard was acting under color law. This claim is made in Chad Leonard's personal

(individual) capacity.

      The constitutional right is the right to be free of unreasonable search and seizure

under the Fourth Amendment to the U.S. Constitution (made applicable to Chad Leonard

by the Due Process Clause of the Fourteenth Amendment) in that Chad Leonard lacked

probable cause to arrest Plaintiffs because the Plaintiffs did not commit a public offense, and Chad Leonard did not have a reasonable ground to believe that the Plaintiffs had committed a public offense.

3. Because of the acts and violations alleged, Plaintiffs have suffered restrictions on their liberty, have been deprived of their constitutional right to be free from unreasonable seizure and imprisonment of their person; have suffered the humiliation, mental anguish, and emotional distress of being wrongfully accused of a crime; have suffered and will continue to suffer emotional distress, and the violation of their constitutional  rights, all to their damage and detriment in amounts to be proven at trial. Plaintiffs have also suffered economic loss in the form of loss of employment opportunities.

4.  In addition, Plaintiffs seek punitive damages against Chad Leonard, in an amount that will deter him, and others similarly situated, from such conduct in the future.

5.  Finally, Plaintiffs seek an award of statutory attorney's fees pursuant to 42 USC §1988.

6. Plaintiffs assert that the common law claims and the violations of the constitution outlined above were clearly established at the time of the violations as reflected in the definition of a tort claim in Iowa Code Chapter 670.1(4) as well as caselaw stating that a warrantless arrest needs to be made with probable cause (e.g., *Maryland v. Pringle,* 540 U.S. 366 (2003); *Habiger v. City of Fargo,* 80 F.3d 289 (8th Cir. 1996)).

7.  The damages claimed exceed the jurisdictional limits pursuant to Rule 6.105 of the Iowa Rules of Appellate Procedure.

WHEREFORE, Plaintiffs pray for judgment against Dallas County and Chad Leonard for a reasonable amount of compensatory damages sufficient to compensate them, together with punitive damages against Defendant Leonard, attorney's fees and expenses, and for interest and costs as provided by law.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury of all fact issues in this case.

Respectfully submitted,

/s/ Martin A. Diaz_____
Martin A. Diaz AT0002000
1570 Shady Ct NW
Swisher, IA 52338
Telephone:      319.339-4350
Facsimile: 319.339-4426
E-Mail:    marty@martindiazlawfirm.com

**CERTIFICATE OF SERVICE**

I hereby certify that on the 21st day of July 2023, a copy of the foregoing document was filed electronically.  Service of this filing will be made on all ECF-registered counsel by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

Jason Palmer
LAMSON DUGAN & MURRAY LLP
1045 76th Street, Suite 3000
West Des Moines, Iowa 50266
Email: jpalmer@ldmlaw.com
ATTORNEY FOR DEFENDANTS

SIGNED:  __/s/ *Martin A. Diaz*