IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| GARY DEMERCURIO and JUSTIN LAWSON WYNN,<br><br>　　　　　Plaintiffs,<br><br>vs.<br><br>DALLAS COUNTY, IOWA, and CHAD LEONARD,<br><br>　　　　　Defendants. | 4:23-cv-00210-SHL-HCA<br><br>**ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS, DENYING MOTION TO STRIKE, AND REMANDING STATE LAW CLAIMS TO STATE COURT** |

**I.　Introduction.**

Dallas County Sheriff Chad Leonard had Plaintiffs arrested after they surreptitiously broke into the Dallas County Courthouse in the middle of the night and refused to release them even after learning the Iowa Judicial Branch had hired Plaintiffs to test security at judicial buildings. The Court concludes that Plaintiffs have not proven that they had a clearly established constitutional right not to be arrested in these unique circumstances, and therefore dismisses their federal law claims. The Court declines to exercise supplemental jurisdiction over Plaintiffs' state law claims and instead remands the case to Iowa state court.

**II.　Procedural and Factual Background.**

　　*A.　Determining the Operative Pleading.*

When this case was removed to federal court, the operative pleading was the Third Amended Petition. (ECF 1-1, pp. 692–701.) On July 12, 2023, Defendants filed their Motion to Dismiss the Third Amended Petition. (ECF 8.) On July 21, 2023, Plaintiffs filed a proposed Fourth Amended Complaint, which they allege could be filed as a matter of right. (ECF 12.) A few days later, however, Plaintiffs also filed a response brief addressing the merits of Defendants' Motion to Dismiss the Third Amended Petition. (ECF 17.) Defendants responded by moving to strike the Fourth Amended Complaint (ECF 19), while also filing a reply in support of their Motion to Dismiss (ECF 22). The parties agree that the Motion to Dismiss briefing applies equally to the Third Amended Petition and Fourth Amended Complaint alike. Thus, in the interest of simplicity, the Court will DENY Defendants' Motion to Strike (ECF 19) and treat the Fourth Amended Complaint as the operative pleading. For purposes of the Motion to Dismiss, the Court accepts as

true all well-pled facts in the Fourth Amended Complaint and draws all reasonable inferences in the light most favorable to Plaintiffs. *Glick v. W. Power Sports, Inc.*, 944 F.3d 714, 717 (8th Cir. 2019).

    B. *Facts.*

At all relevant times, Plaintiffs Gary DeMercurio and Justin Wynn worked for Coalfire Labs ("Coalfire"), a cybersecurity firm headquartered in Colorado. (ECF 12, ¶¶ 5, 6.) In 2015 and 2019, the Iowa Judicial Branch, through the State Court Administrator, retained Coalfire to perform a cybersecurity analysis of the Iowa Court system pursuant to a "Service Order" and "Rules of Engagement." (Id., ¶¶ 9, 13–14.) The Iowa Judicial Branch wanted Plaintiffs to test the security of the Iowa Judicial Branch, including testing the security of five physical facilities, one of which was the Dallas County Courthouse in Adel, Iowa. (Id., ¶¶ 16–17.) The Rules of Engagement included external, internal, and application testing, as well as social engineering activities that involved "physical attacks" such as "lockpicking." (Id., ¶¶ 18–19.) The "physical attacks" were to be conducted "during the day and evening." (Id., ¶ 20.) The Rules of Engagement anticipated that Plaintiffs would seek to breach judicial branch buildings so long as it could be done without significant physical damages to the buildings, such as breaking windows. (Id., ¶ 21.) The Iowa Judicial Branch gave oral and written approval for the surreptitious entry of courthouses and other judicial buildings. (Id., ¶ 22.) The Iowa Judicial Branch did not want local law enforcement to be notified in advance of the penetration testing that Plaintiffs would perform. (Id., ¶ 24.) However, as a form of protection, Plaintiffs were given a Letter of Authorization signed by employees of the State Court Administrator's Office of the Iowa Judicial Branch. (Id., ¶ 25.) Plaintiffs refer to this Letter colloquially as a "Get Out of Jail Free" card. (Id.)

Between September 8 and 10, 2019, Plaintiffs tested the security systems at the Polk County Courthouse and adjacent buildings, as well as at the Iowa Judicial Branch Building. (Id., ¶ 28.) On the night of September 10, 2019 (and carrying over into the early morning hours of September 11), Plaintiffs went to the Dallas County Courthouse to perform similar penetration testing. (Id., ¶ 31.) When they arrived, they found one of the doors to the Courthouse unlocked. (Id., ¶ 32.) To continue with their testing, Plaintiffs closed and locked that door and then began trying to obtain entry to the Courthouse. (Id., ¶ 32.) In the process, they intentionally tripped the security alarm, which was part of the purpose of the penetration testing. (Id., ¶¶ 33–34.) Once the alarm was tripped, Plaintiffs waited for law enforcement to arrive. (Id., ¶ 33.)

Deputies from the Dallas County Sheriff's Office arrived at approximately 12:35 a.m. (Id., ¶ 35.) Within minutes, Plaintiffs identified themselves and provided the "Get Out of Jail Free" card. (Id., ¶ 36.) The deputies contacted one of the individuals who signed the "Get Out of Jail Free" card, who confirmed that Plaintiffs were acting within the scope of Coalfire's contract with the Iowa Judicial Branch. (Id., ¶ 38.) At 12:54 a.m., one of the Dallas County deputies said he had spoken with the chief security officer for the Iowa Courts and confirmed that Plaintiffs were working under a contract with the Iowa Judicial Branch. (Id., ¶ 41.) He said Plaintiffs were "good to go." (Id., ¶¶ 41–42.) In total, at the time, five Dallas County deputies and one City of Adel police officer were on the scene. (Id., ¶ 43.) None of the six expressed any interest in arresting Plaintiffs. (Id.)

At 12:57 a.m., Defendant Chad Leonard, the Dallas County Sheriff, arrived. (Id., ¶ 44.) One of the deputies said, "this ought to be good." (Id., ¶ 45.) Plaintiffs told Sheriff Leonard that they were working under a contract with Iowa Courts. (Id., ¶ 46.) Leonard said, "maybe they can come and bond you out." (Id.) While on the scene, Leonard learned from deputies that Plaintiffs indeed had a contract with the Iowa Judicial Branch and had been authorized to enter the building for the purpose of testing the court security system. (Id., ¶¶ 47–48.) Leonard refused to recognize the authority of the Iowa Judicial Branch to permit Plaintiffs to perform testing at the Dallas County Courthouse, and instead ordered his deputies to arrest Plaintiffs. (Id., ¶ 49.)

At some point, Leonard spoke by phone with one of the state officials listed on the "Get Out of Jail Free" card, who explained that Plaintiffs were working on behalf of the State of Iowa. (Id., ¶ 52.) The state official questioned Leonard's authority to arrest Plaintiffs, which resulted in Leonard becoming upset. (Id.) The state official was later disciplined for how he spoke to Leonard. (Id.) Leonard had a pre-existing personal animus with the authority of the State of Iowa that affected his decision-making. (Id., ¶ 53.) Plaintiffs were arrested, booked, and held in the County Jail for approximately twenty hours. (Id., ¶ 54.) They were later released on $50,000 bond. (Id.) Leonard took steps to influence the Dallas County Attorney to continue prosecuting Plaintiffs. (Id., ¶ 55.) Initially, Plaintiffs were charged with Burglary in the Third Degree and Possession of Burglar Tools. (Id., ¶ 56.) The charges were later amended to Trespass before eventually being dismissed altogether. (Id., ¶¶ 57–58.)

In the days and weeks after the arrests, Leonard continued to claim that Plaintiffs had "burglarized" the Dallas County Courthouse in statements to state officials, through the press, and

to local citizens. (Id., ¶ 59.) For example, on September 26, 2019, Leonard told the Central Committee of the Republican Party that Plaintiffs were "burglars" and committed a crime. (Id., ¶ 60.) He made these statements with full knowledge that Plaintiffs were working for a company that had contracted with the State of Iowa to perform security and cybersecurity services for the court system. (Id.)

In the Fourth Amended Complaint, Plaintiffs assert state law claims against Defendants Leonard and Dallas County for false arrest, abuse of process, defamation, intentional infliction of emotional distress, and malicious prosecution. (Id., Count I, ¶ 1.) Plaintiffs also assert federal claims against Leonard in his personal (individual) capacity pursuant to 42 U.S.C. § 1983. (Id., Count I, ¶ 2.) Plaintiffs allege that Leonard violated their Fourth Amendment right to be free from unreasonable searches and seizures. (Id.)

## III.   Legal Background – Motion to Dismiss and Qualified Immunity Standards.

   *A.   Motion to Dismiss Standards.*

"To survive a motion to dismiss, a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Rydholm v. Equifax Info. Servs. LLC*, 44 F.4th 1105, 1108 (8th Cir. 2022) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "The plausibility standard requires a plaintiff to show at the pleading stage that success on the merits is more than a 'sheer possibility.'" *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009) (quoting *Iqbal*, 556 U.S. at 678). In determining plausibility, the Court accepts all factual allegations in the complaint as true and draws all reasonable inferences in the plaintiff's favor. *Richter v. Advance Auto Parts, Inc.*, 686 F.3d 847, 850 (8th Cir. 2012) (per curiam). The Court is not obligated to accept legal conclusions, however, and "[a] pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do." *United States ex rel. Ambrosecchia v. Paddock Lab'ys, LLC*, 855 F.3d 949, 955 (8th Cir. 2017) (quoting *Iqbal*, 556 U.S. at 678).

"Though matters outside the pleadings may not be considered in deciding a Rule 12 motion to dismiss, documents necessarily embraced by the complaint are not matters outside the pleading." *Zean v. Fairview Health Servs.*, 858 F.3d 520, 526 (8th Cir. 2017) (cleaned up) (quoting *Enervations, Inc. v. Minn. Min. & Mfg. Co.*, 380 F.3d 1066, 1069 (8th Cir. 2004)). "In general, materials embraced by the complaint include 'documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the

pleadings.'" *Id.* (quoting *Ashanti v. City of Golden Valley*, 666 F.3d 1148, 1151 (8th Cir. 2012)). Here, Defendants have attached the "Get Out of Jail Free" card to their Motion to Dismiss. (ECF 8-6.) As this document is specifically referenced in the Fourth Amended Complaint, and as its authenticity is not in question, the Court will consider it in ruling on the Motion to Dismiss. *See, e.g., Zean*, 858 F.3d at 527 (considering document on motion to dismiss where there was no genuine dispute as to authenticity).

    B. *Qualified Immunity Standards.*

Plaintiffs bring claims against Leonard (but not Dallas County) pursuant to 42 U.S.C. § 1983, which imposes liability on any person who, acting under color of law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws . . . ." Government officials are protected against section 1983 claims by the doctrine of qualified immunity, which frees them from liability unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

"Qualified immunity 'is an immunity from suit rather than merely a defense to liability.'" *Solomon v. Petray*, 699 F.3d 1034, 1038 (8th Cir. 2012) (emphasis omitted) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson*, 555 U.S. at 231. Qualified immunity "is effectively lost if a case is erroneously permitted to go to trial." *Mitchell*, 472 U.S. at 526.

Law enforcement officers are entitled to qualified immunity "unless: (1) [they] violated a constitutional right, and (2) that constitutional right was clearly established so that a reasonable officer would know of the right at the time of the alleged violation.'" *Thurairajah v. City of Fort Smith*, 925 F.3d 979, 982 (8th Cir. 2019). Courts may address these issues in either order, and a plaintiff must satisfy both prongs before a claim may proceed to trial. *See Pearson*, 555 U.S. at 241. "Under either prong of the inquiry, the district court 'may not resolve genuine disputes of fact' relevant to the issue of qualified immunity." *Wealot v. Brooks*, 865 F.3d 1119, 1125 (8th Cir. 2017) (quoting *Tolan v. Cotton*, 572 U.S. 650, 656 (2014)). Moreover, all disputed facts must be

interpreted in the plaintiff's favor when defendants move for judgment as a matter of law based on qualified immunity. *Tolan*, 572 U.S. at 657.

IV. **Legal Analysis – Section 1983 Claims.**

    A. *Fourth Amendment Standards.*

Plaintiffs allege illegal seizure without probable cause in violation of the Fourth Amendment. "To establish a Fourth Amendment violation, 'the claimant must demonstrate a seizure occurred and the seizure was unreasonable.'" *Quraishi v. St. Charles County*, 986 F.3d 831, 839 (8th Cir. 2021) (quoting *McCoy v. City of Monticello*, 342 F.3d 842, 846 (8th Cir. 2003)). "A Fourth Amendment seizure occurs when an officer restrains the liberty of an individual through physical force or show of authority." *McCoy*, 342 F.3d at 846. A warrantless arrest is unreasonable if an officer lacks probable cause. *Robbins v. City of Des Moines*, 984 F.3d 673, 679 (8th Cir. 2021). "Officers are nonetheless entitled to qualified immunity if there is 'arguable probable cause,' which exists when an officer mistakenly arrests a suspect believing it is based in probable cause if the mistake is 'objectively reasonable.'" *Id.* at 680 (cleaned up) (quoting *Ulrich v. Pope Cnty*, 715 F.3d 1054, 1059 (8th Cir. 2013)).

"Fourth Amendment reasonableness 'is predominantly an objective inquiry.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 736 (2011) (quoting *Indianapolis v. Edmond*, 531 U.S. 32, 47 (2000)). "We ask whether 'the circumstances, viewed objectively, justify [the challenged] action." *Id.* (quoting *Scott v. United States*, 436 U.S. 128, 138 (1978)). "If so, that action was reasonable '*whatever* the subjective intent' motivating the relevant officials." *Id.* (quoting *Whren v. United States*, 517 U.S. 806, 814 (1996)). "This approach recognizes that the Fourth Amendment regulates conduct rather than thoughts . . . and it promotes evenhanded, uniform enforcement of the law." *Id.*

    B. *Leonard Did Not Violate Plaintiffs' Clearly Established Constitutional Rights in the Unique Circumstances Presented Here.*

It cannot seriously be doubted that the Dallas County deputies had a reasonable basis for detaining Plaintiffs when the deputies first arrived on the scene in the early morning hours of September 11, 2019. Plaintiffs had surreptitiously entered the Dallas County Courthouse in the middle of the night, possessed tools that aided them in doing so, and set off a security alarm. Moreover, although Plaintiffs said they were authorized to be there as part of a contract with the Iowa Judicial Branch to test security, deputies were not obligated to accept these statements at face value—or even after being presented with the so-called "Get Out of Jail Free" card.

By the time Sheriff Leonard arrived approximately twenty minutes later, however, circumstances had changed. As alleged by Plaintiffs, the deputies had confirmed with the chief security officer of the Iowa court system that Plaintiffs indeed were operating under a contract with the Iowa Judicial Branch and had been authorized to force entry into the Dallas County Courthouse and other judicial buildings. Moreover—and, again, as alleged by Plaintiffs—Leonard himself confirmed the same during a phone call with a different state official. According to Plaintiffs, Leonard's decision to have them arrested was the result of his frustration with having his authority challenged during the phone call rather than any sort of good faith belief that Plaintiffs had committed a crime. These allegations are plausible and, if true, troubling, as they would mean Plaintiffs were arrested for being in a place they were authorized to be simply because of a "turf war" between the Iowa Judicial Branch and Dallas County Sheriff.

The problem for Plaintiffs, however, is that they must do more than simply make plausible allegations that they were arrested without probable cause. They also must establish that Leonard violated their "clearly established" constitutional rights in doing so. "A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Morgan v. Robinson*, 920 F.3d 521, 523 (8th Cir. 2019) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). "In determining whether a right is clearly established, the Supreme Court has 'repeatedly' cautioned courts 'not to define clearly established law at a high level of generality.'" *Central Specialties, Inc. v. Large*, 18 F.4th 989, 996 (8th Cir. 2021) (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam)). "The dispositive question is 'whether the violative nature of *particular* conduct is clearly established.'" *Id.* (quoting *Mullenix*, 577 U.S. at 12). "This inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Id.* (quoting *Mullenix*, 577 U.S. at 12). "There need not be a case 'directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.'" *Morgan*, 920 F.3d at 524 (quoting *al-Kidd*, 563 U.S. at 741).

Plaintiffs cannot prove the "clearly established" prong here. Plaintiffs have not cited—and, despite careful research, the Court has not independently been able to locate—a case in which an officer is held to have violated the Fourth Amendment by detaining a person who surreptitiously broke into a building in the middle of the night but later turned out to have had the authority to do so. And even if such a case existed, there is an extra wrinkle here: the officials who authorized Plaintiffs' entry into the building were from the Iowa Judicial Branch, but the building itself is the

*Dallas County* Courthouse. While the Court is inclined to agree with Plaintiffs that the Iowa Judicial Branch has the authority to control access to courthouses throughout the State, the extent to which the Judicial Branch can exercise such control independently of other government officials—including, e.g., the County Sheriff—is not clearly delineated under Iowa law. In fact, the Fourth Amended Complaint illustrates the point. It cites Iowa Code §§ 331.365 and 602.1303 for the proposition that the "Iowa Judicial Branch is entitled to use of the Dallas County Courthouse" (ECF 12, ¶ 50), but the former statute does not even exist, and the latter simply says counties are responsible for providing courthouse facilities, not that the Judicial Branch has unilateral control over them. Meanwhile, a separate statute, Iowa Code § 331.502(1), says the County *Auditor* "shall . . . [h]ave general custody and control of the courthouse, subject to the direction of the board [of supervisors]."

In the face of these unique circumstances, Plaintiffs have "present[ed] no case that comes close to demonstrating that the rights [they] allege[] were violated were clearly established." *Large*, 18 F.4th at 997. Indeed, the situation here layers two unusual sets of facts on top of one another, the first involving the surreptitious break-in at midnight and the second involving a jurisdictional dispute over who has the right to authorize entry to a county courthouse. Plaintiffs cannot as a matter of law prove they had a "clearly established" constitutional right not to be arrested in these circumstances. *See, e.g.*, *L.G. through M.G. v. Columbia Pub. Sch.*, 990 F.3d 1145, 1148 (8th Cir. 2021) (reversing denial of motion to dismiss in section 1983 case involving the Fourth Amendment because the case had "distinguishing feature[s]" from existing precedent); *Lewis v. City of St. Louis*, 932 F.3d 646, 649 (8th Cir. 2019) (granting qualified immunity because of legal uncertainty over who was responsible for communicating dismissal of charges to the facility where plaintiff was in custody). Their section 1983 claims therefore must be dismissed pursuant to Fed. R. Civ. P. 12(b)(6). *See id.*

It does not matter that Plaintiffs have a clearly established Fourth Amendment right not to be arrested without probable cause. "That is certainly true in a general sense," but their claims cannot proceed without a greater degree of specificity to "take into account the particular circumstances that the officer faced." *Columbia Pub. Sch.*, 990 F.3d at 1148. "Specificity is 'especially important in the Fourth Amendment context.'" *Id.* (quoting *D.C. v. Wesby*, 583 U.S. 48, 64 (2018)). Given the highly unusual circumstances here, Plaintiffs cannot satisfy the specificity requirement. *See Columbia Pub. Sch.*, 990 F.3d at 1148; *Lewis*, 932 F.3d at 649.

## V. Supplemental Jurisdiction – State Law Claims.

Plaintiffs' remaining claims against Leonard and co-defendant Dallas County arise under state law and include causes of action for false arrest, abuse of process, defamation, intentional infliction of emotional distress, and malicious prosecution. Plaintiffs filed their state court petition in July 2021, and litigation proceeded in that forum for almost two years, including, *inter alia*, a lengthy and thoughtful ruling on Defendants' motion to dismiss the state law claims. (ECF 1-1, pp. 30–46.) It was not until June 2023 that the action was removed to this Court following the addition of a federal cause of action.

"A district court 'may decline to exercise supplemental jurisdiction over a claim' if the 'court has dismissed all claims over which it has original jurisdiction.'" *Hinshaw v. Moore*, 666 F. App'x 565, 569 (8th Cir. 2016) (quoting 28 U.S.C. § 1367(c)(3)). The Court has discretion in deciding whether to exercise supplemental jurisdiction, but it is often appropriate to decline to do so when the only remaining claims arise under state law and litigation advanced to a meaningful degree in state court prior to removal. *See id.*; *see also Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988) (identifying factors such as "judicial economy, convenience, fairness, and comity"). As these circumstances are present here, the Court declines to exercise supplemental jurisdiction over Plaintiffs' state law claims. Instead, the case will be remanded to Iowa state court. The Court therefore will not address Defendants' arguments on the merits of the state law claims.

## VI. Conclusion.

As Plaintiffs have not proven a clearly established constitutional right not to be arrested in the circumstances presented here, their federal claims must be dismissed. The Court therefore **GRANTS IN PART** Defendants' Motion to Dismiss (ECF 8) as it relates to Plaintiffs' claims under 42 U.S.C. § 1983. The Court declines to exercise supplemental jurisdiction over Plaintiffs' state law claims, however, and therefore **DENIES IN PART** Defendants' Motion to Dismiss as it relates to those claims. The Court **REMANDS** the case to the Iowa District Court.

**IT IS SO ORDERED.**

Dated: September 27, 2023

_____
STEPHEN H. LOCHER
U.S. DISTRICT JUDGE